# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 15-cv-80486-BLOOM/Valle

WILBUR VEASY,

     Plaintiff,

v.

RIC L. BRADSHAW,
as Sheriff of Palm Beach County,

     Defendant.

_____/

## ORDER ON DEFENDANT'S
## RENEWED MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court upon Defendant Ric. L. Bradshaw's ("Defendant" or

"Sheriff Bradshaw") Renewed Motion for Summary Judgment, ECF No. [63] (the "Motion"),

following remand from the United States Court of Appeals for the Eleventh Circuit, *see* ECF No.

[60] (Mandate of the Eleventh Circuit, or "Mandate"). The Court has reviewed the Motion, all

opposing and supporting submissions, the record and the applicable law, and is otherwise fully

advised. For the reasons set forth below, the Motion is granted.

## I. BACKGROUND

Plaintiff, an African American man, was hired by the Palm Beach County Sheriff's

Office ("PBSO") on October 1, 1987 as a corrections officer to work in the Palm Beach County

jail. Defendant's Statement of Undisputed Material Facts, ECF No. [64] ("Def. SOF") at ¶ 1;

Plaintiff's Verified Response to Defendant's Renewed Statement of Undisputed Material Facts,

ECF No. [68] ("Pl. SOF") at ¶ 1. More than twenty-five years later, on April 19, 2013, PBSO

fired Plaintiff. Def. SOF at ¶ 1; Pl. SOF at ¶ 1. During the period of his employment, Plaintiff

was subject to multiple disciplinary actions taken by PBSO, a number of which were the result of

what PBSO classified as insubordination offenses. *See* Def. SOF at ¶ 2.[1]  The last of those disciplinary actions—which would ultimately include Plaintiff's termination—stemmed from events that took place on February 5, 2013.  *See id.* at ¶¶ 7-13; Pl. SOF at ¶¶ 7-13.

On February 5, 2013, Plaintiff was notified by the secretary of the Division of Internal Affairs ("Internal Affairs") that he had been randomly selected to submit to a drug test pursuant to PBSO's random drug and alcohol testing policy.[2]  Def. SOF at ¶ 7.  According to Defendant, Sergeant Brett Combs ("Sergeant Combs") with Internal Affairs first advised Plaintiff via telephone to drive his personal vehicle to the testing site when Plaintiff asked how he was supposed to get to the testing site. Plaintiff refused, and was thereafter ordered to report to Internal Affairs.  *Id.* at ¶ 8.  Apparently disputing that he was initially advised to drive his personal vehicle to the testing site, however, Plaintiff asserts that Sergeant Combs informed him via telephone to appear at Internal Affairs, to which he complied.  Pl. SOF at ¶ 8.

Relatedly, the parties dispute certain aspects of PBSO's random drug and alcohol testing policy, particularly as they relate to the location of where a corrections officer selected for random testing is to report.  Defendant asserts that a corrections officer selected for random testing was previously required to report to Internal Affairs for testing. However, in November of 2011, PBSO switched to an outside company to administer the sample collection and testing. Def. SOF at ¶¶ 5-6.  Defendant also asserts that at the time of Plaintiff's random selection, approximately 250 corrections employees had participated in the drug-testing program by reporting directly to the outside company for testing.  *Id.* at ¶ 6.  Plaintiff, on the other hand,

---

[1] Where a fact is uncontroverted by the opposing party, the Court cites only to the originating Statement of Facts.

[2] Pursuant to that policy, an employee has four hours to take a drug or alcohol test once randomly selected to do so, and an employee's refusing to submit, failing to appear when directed, refusing to sign any necessary consent forms, or attempting to tamper with a random test is cause for discipline, up to and including termination for a first offense.  Def. SOF at ¶ 3.

denies those assertions, stating that "[t]here was no written policy change until after my termination."  Pl. SOF at ¶¶ 5-6.

Once at Internal Affairs, Plaintiff twice refused orders by Sergeant Combs to report to the testing site in his personal vehicle.  Def. SOF at ¶ 9; *see also* Pl. SOF at ¶ 11.  Plaintiff's response to being ordered to drive to the testing site in his personal vehicle was subsequently "escalated" to Sheriff Bradshaw, who gave Plaintiff the option of either driving to the test site in his personal vehicle or being placed on administrative leave.  Def. SOF at ¶ 10.  Plaintiff responded that his "2007 red four door Tacoma is not going," and Plaintiff was subsequently placed on administrative leave.  *Id.*  Thereafter, PBSO conducted an Internal Affairs investigation into the matter and concluded that Plaintiff had violated two rules and regulations. *Id.* at ¶ 11; Pl. SOF at ¶ 11.  Captain Frank Milo ("Captain Milo"), who was assigned to review the Internal Affairs investigation and to make a discipline recommendation, recommended termination. This was based upon his review, Plaintiff's prior disciplinary history, and what was perceived as Plaintiff's "recurring problem with insubordination."  Def. SOF at ¶ 12.  On April 19, 2013, following a pre-disciplinary hearing, Plaintiff's employment was terminated.[3]  *Id.* at ¶ 13.

Plaintiff subsequently filed a claim for unemployment benefits, which was denied after a hearing before an appeals referee.  *Id.* at ¶ 14.  Plaintiff appealed that denial, which was ultimately affirmed by both the Reemployment Assistance Appeals Commission and the Florida Fourth District Court of Appeal.  *Id.*  Plaintiff also filed a grievance and requested arbitration pursuant to a Collective Bargaining Agreement ("CBA").  *Id.* at ¶ 15.  The arbitrator found that PBSO had just cause to terminate Plaintiff under the CBA. That determination was confirmed by

---

[3] Plaintiff acknowledges that the only reason ever given to him for his termination was the result of the Internal Affairs investigation.  *Id.* at ¶ 21.

the Palm Beach County Circuit Court when it denied a subsequent motion to vacate filed by Plaintiff. *Id.*

On April 14, 2015, Plaintiff brought suit against Defendant under 42 U.S.C. §§ 1981 and 1983 and the Equal Protection Clause of the 14th Amendment to the U.S. Constitution, alleging employment discrimination and retaliation based on his race. More specifically, Plaintiff's Complaint asserts a discrimination claim alleging that Defendant terminated Plaintiff because of Plaintiff's race (Count I) and a retaliation claim alleging that Defendant terminated Plaintiff after Plaintiff complained of race discrimination (Count II).[4] On February 23, 2016, this Court granted summary judgment in favor of Defendant with respect to both of Plaintiff's claims upon determining that Defendant was entitled to Eleventh Amendment immunity. *See* ECF Nos. [41]-[42].[5] Plaintiff then appealed. *See* ECF No. [47].

Ultimately, the Eleventh Circuit reversed this Court's Order granting summary judgment in favor of Defendant and remanded the case, holding that Defendant is not entitled to Eleventh Amendment immunity. *See* ECF No. [60] at 4 (citing *Stanley v. Broward Cnty. Sheriff*, 843 F.3d 920 (11th Cir. 2016)). In remanding the case, the Eleventh Circuit left it to this Court to decide in the first instance whether Defendant is entitled to summary judgment on the merits. *Id.* at 4 n.2. In the instant Motion, Defendant renews his request for summary judgment. Defendant argues that Plaintiff has failed to establish a *prima facie* case of race discrimination and retaliation and has also failed to demonstrate that Defendant's legitimate, non-discriminatory and non-retaliatory reason for the termination of Plaintiff is mere pretext. *See* ECF No. [63].

---

[4] For purposes of his retaliation claim, the protected activity Plaintiff alleges that he engaged in and that served as the basis for the retaliation against him relates to the following: a 2005 lawsuit for race discrimination and retaliation decided against him in 2006; a 2001 Charge of Discrimination and a 2014 Charge of Discrimination; and a grievance filed in 2004. *See id.* at ¶ 16.

[5] Defendant had also moved for summary judgment on the merits in addition to moving for summary judgment on Eleventh Amendment grounds, but this Court addressed only Defendant's entitlement to Eleventh Amendment immunity.

## II.    LEGAL STANDARD

A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The parties may support their positions by citation to the record, including, *inter alia*, depositions, documents, affidavits, or declarations.  *See* Fed. R. Civ. P. 56(c).  An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F. 3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).  A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48).  The Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in the party's favor.  *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.  The Court does not weigh conflicting evidence.  *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting *Carlin Comm'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

The moving party shoulders the initial burden to demonstrate the absence of a genuine issue of material fact.  *See Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008).  If a movant satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'"  *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  Instead, "the non-moving party 'must make a sufficient showing on each

essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor. *Shiver*, 549 F.3d at 1343.

In resolving the issues presented under Fed. R. Civ. P. 56, "the court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied." *Carlin Commc'n, Inc. v. Southern Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986); *see also Aurich v. Sanchez*, 2011 WL 5838233, at *1 (S.D. Fla. Nov. 21, 2011) ("If a reasonable fact finder could draw more than one inference from the facts, and that inference creates an issue of material fact, then the court must not grant summary judgment." (citing *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913 (11th Cir. 1993)). Even "where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from those facts," summary judgment may be inappropriate. *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).

## III.  DISCUSSION

### A.  Discrimination Claim under 42 U.S.C. §§ 1981 and 1983 (Count I)[6]

Similar to Title VII, which prohibits an employer from discriminating against a person based on race or sex, *see* 42 U.S.C. §§ 2000e–2(a)(1), under 42 U.S.C. § 1981, "an employee has the right to be free of intentional racial discrimination in the performance of a contract."

---

[6] *See generally Bryant v. Jones*, 575 F.3d 1281, 1288 n.1 (11th Cir. 2009) (explaining that the Eleventh Circuit has "held that § 1981 does not provide an implicit cause of action against state actors; therefore, § 1983 constitutes the exclusive federal remedy for violation by state actors of the rights guaranteed under § 1981") (citing *Butts v. County. of Volusia*, 222 F.3d 891, 894-95 (11th Cir. 2000)); *Flowers v. Troup Cnty., Ga., Sch. Dist.*, 2014 WL 842934, at *4 (N.D. Ga. Mar. 5, 2014) ("Race-discrimination claims levied against state actors . . . must be brought under § 1983.")

*Summers v. City of Dothan, Ala.*, 444 F. App'x 346, 347 (11th Cir. 2011); *see also Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474-75 (2006) ("Among the many statutes that combat racial discrimination, § 1981 . . . has a specific function: It protects the equal right of '[a]ll persons within the jurisdiction of the United States' to 'make and enforce contracts' without respect to race.") (quoting 42 U.S.C. § 1981(a)); 42 U.S.C. § 1981(b) (including in the definition of the phrase "make and enforce contracts" "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."). As such, the elements of a § 1981 discrimination claim are the same as those of a Title VII discrimination claim. *Summers*, 444 F. App'x at 347 (citing *Rice–Lamar v. City of Ft. Lauderdale*, 232 F.3d 836, 843 n. 11 (11th Cir. 2000)).

A plaintiff may establish a discrimination claim through the presentation of direct or circumstantial evidence of discrimination. *Dixon v. The Hallmark Companies, Inc.*, 627 F.3d 849, 854 (11th Cir. 2010). Where, as here, the plaintiff relies on circumstantial evidence of discrimination,[7] courts are to apply the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010); *see also Turnes v. AmSouth Bank, NA*, 36 F.3d 1057, 1060 (11th Cir.1994) ("The *McDonnell Douglas* scheme for the allocation of burdens and the order of presentation of proof also applies in § 1981 cases involving discriminatory treatment in employment situations."). Pursuant to that framework, the plaintiff must first establish a *prima facie* case of discrimination, whereby the plaintiff "must show that (1) []he is a member of a protected class; (2) []he was qualified for the job; (3) []he suffered an adverse employment action; and (4) [his] employer treated similarly situated employees outside the protected class

---

[7] Plaintiff concedes that no racially related remarks or comments were ever made to him by Defendant or other PBSO officials involved in the investigation that led to his termination. Def. SOF at ¶ 21.

more favorably or, for a termination, was replaced by a person outside the protected class." *Addison v. Florida Dep't of Corr.*, --- F. App'x ----, 2017 WL 1130175, at *2 (11th Cir. 2017) (citing *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999)); *see also Alvarez*, 610 F.3d at 1264; *Burke–Fowler v. Orange Cnty.*, 447 F.3d 1319, 1323 (11th Cir. 2006). Once a *prima facie* case is shown, a presumption of unlawful discrimination is created and the burden of production shifts to the defendant to offer a legitimate, non-discriminatory reason for the adverse employment action. *Alvarez*, 610 F.3d at 1264; *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). Once the defendant proffers such a reason, the burden shifts back to the plaintiff to show that the proffered reason is a mere pretext for unlawful discrimination. *Alvarez*, 610 F.3d at 1264.

Additionally, in the Eleventh Circuit, a determination as to whether employees are similarly situated in cases involving allegedly discriminatory discipline requires evaluating "whether the employees [were] involved in or accused of the same or similar conduct and [were] disciplined in different ways." *Burke–Fowler*, 447 F.3d at 1323 (internal quotation marks omitted). "The quantity and quality of the comparator's misconduct must be 'nearly identical' to the plaintiff's misconduct, in order 'to prevent courts from second-guessing employers' reasonable decisions." *Summers*, 444 F. App'x at 347 (quoting *Burke–Fowler*, 447 F.3d at 1323). In other words, "alleged comparators must be similarly situated in all relevant respects. Otherwise, the alleged preferential treatment towards non-identical comparators does not indicate pretext." *Addison*, 2017 WL 1130175, at *4 (quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004)) (internal quotation marks and citation omitted). Importantly, "[i]f a plaintiff fails to show the existence of a similarly situated employee,

summary judgment is appropriate where no other evidence of discrimination is present." *Wilson*, 376 F.3d at 1092 (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

>  i.  *Prima Facie Case Assumed*

Defendant argues that Plaintiff fails to show a *prima facie* case of race discrimination because there is no evidence that Defendant treated similarly situated employees outside his protected class more favorably. *See* ECF No. [63] at 2-3 (citing *Holifield*, 115 F.3d at 1562). In the Defendant's view, the two purported comparators relied upon by Plaintiff—Deputy Sheriff Joshua Plant ("Deputy Plant") and Sergeant Daniel Burrows ("Sergeant Burrows") (both white)—are not similarly situated. *See id.* Defendant further argues that even if Plaintiff could show a *prima facie* case, Defendant has articulated a legitimate, non-discriminatory reason for Plaintiff's termination, which Plaintiff has failed to demonstrate was merely a pretext. *See id.* at 3. The Court agrees with the latter. Thus, Plaintiff's discrimination claim fails even if he has established a *prima facie* case. *See generally Morrison v. City of Bainbridge, GA*, 432 F. App'x 877, 881 n.2 (11th Cir. 2011) (explaining that in applying the *McDonnell Douglas* framework, "when an employer has offered a legitimate, nondiscriminatory reason for an employee's termination, whether a plaintiff made out a prima facie case is almost always irrelevant in considering a motion for summary judgment.") (citing *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 492 (D.C. Cir. 2008)).

As an initial matter, Plaintiff argues that a *prima facie* case for race discrimination does not require the existence of a comparator, and not without good reason. In *Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1336 (11th Cir. 2015), the Eleventh Circuit explained that in race discrimination cases, a plaintiff makes out a *prima facie* case "when he shows by a preponderance of the evidence (1) that he is a member of a protected racial class, (2) that he was

qualified for the position, (3) that he experienced an adverse employment action, and (4) that he was replaced by someone outside of his protected class *or received less favorable treatment than a similarly situated person outside of his protected class*." (citing *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003)) (emphasis added). However, two very recent unpublished decisions by the Eleventh Circuit indicate that comparators are a necessary component in this context. *See Addison*, 2017 WL 1130175, at *2 ("To establish a prima facie case of race [] discrimination a plaintiff *must* show that . . . [his] employer treated similarly situated employees outside the protected class more favorably or, for termination, was replaced by a person outside the protected class") (citing *Maniccia*, 171 F.3d at 1368) (emphasis added); *Brooks v. U.S. Dep't of the Air Force*, 2017 WL 1360769, at *1 (11th Cir. 2017) ("To make out a *prima facie* case [of race discrimination], a plaintiff *must* demonstrate . . . he was replaced by a person outside his protected class or was treated less favorably than a similarly-situated individual outside his protected class.") (citing *McDonnell Douglas*, 411 U.S. at 802) (emphasis added). Nonetheless, in *Wilson*, the Eleventh Circuit affirmed summary judgment in favor of the defendant with respect to the plaintiff's discrimination claim which alleged that the defendant terminated the plaintiff on the basis of her sex. 376 F.3d 1079. Relevant to the Eleventh Circuit's decision was the plaintiff's failure to identify a comparator, which the district court found pertinent in the *prima facie* determination. *See id.* at 1091-92. But on appeal the Eleventh Circuit clarified as follows:

> The district court found that Wilson failed to establish a prima facie case of discrimination in the termination of her employment. . . . Wilson's failure to identify a comparator does not end the analysis of her termination claim, however. If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate *where no other evidence of discrimination is present*.

*Id.* (internal quotation marks omitted) (emphasis in the original) (quoting *Holifield*, 115 F.3d at 1562). According to Plaintiff, he has established a *prima facie* case because he "is a member of a protected class, [] was qualified for his employment and was discharged[.]" ECF No. [67] at 9. The Court gives Plaintiff the benefit of the doubt and assumes, without deciding, that he has established a *prima facie* case irrespective of any purported comparators.[8]

### ii. *Legitimate Non-discriminatory Reason for Plaintiff's Termination*

The Court next considers whether Defendant has articulated a legitimate, non-discriminatory reason for Plaintiff's termination, which Defendant surely has. Defendant states that the reason for Plaintiff's termination was insubordination—namely, Plaintiff "repeatedly refus[ed] to comply with directives from Internal Affairs to go . . . for drug testing as the final incident in a history of multiple insubordination offenses." ECF No. [63] at 9. This reason undoubtedly qualifies as legitimate and nondiscriminatory. *See, e.g.*, *Jarvis v. Siemens Medical Solutions USA, Inc.*, 460 F. App'x 851 (11th Cir. 2012) ("insubordination" found to be a legitimate and nondiscriminatory proffered reason for the plaintiff's termination). Plaintiff must therefore demonstrate that this proffered reason is mere pretext for unlawful discrimination.

### iii. *No Evidence of Pretext*

"A plaintiff may show pretext by either directly persuading the court that a discriminatory reason motivated the employer, or by indirectly showing that the employer's proffered explanation is unworthy of credence." *Ivey v. Paulson*, 222 F. App'x 815, 818 (11th Cir. 2007) (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). Under the second method, a plaintiff must establish "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons .

---

[8] In his Motion, Defendant assumes that Plaintiff has satisfied all other elements required to establish a *prima facie* case. *See* ECF No. [63] at 2.

. . that a reasonable factfinder could find them unworthy of credence." *Moore v. Jefferson Cnty. Dep't of Human Res.*, 277 F. App'x 857, 859 (11th Cir. 2008) (citing *Cooper v. S. Co.*, 390 F.3d 695, 725 (11th Cir. 2004)).  Importantly, "[t]he inquiry into pretext centers upon the employer's beliefs and not the employee's own perceptions of his performance." *Mitchell v. City of LaFayette*, 504 F. App'x 867, 871 (11th Cir. 2013) (quoting *Holifield*, 115 F.3d at 1565); *see also Wilson*, 376 F.3d at 1088 ("If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it.").

Here, Plaintiff essentially makes two arguments that Defendant's proffered reason for Plaintiff's termination is unworthy of credence.  *See* ECF No. [67] at 9-15.  First, Plaintiff contends that Defendant deviated from its own PBSO policies in terminating him.  *See id.* at 9-12.  More specifically, Plaintiff states that he did not actually violate the applicable work place rule because he appeared at Internal Affairs ready and able to provide a urine sample. Plaintiff emphasizes that PBSO's random drug and alcohol testing policy at the time required employees to report to Internal Affairs for testing; the policy did not require employees to report to any other location for testing.  *See id.* at 12.  Moreover, according to Plaintiff, Defendant's claimed consideration of  "all of [] Plaintiff's past disciplinary history" violated PBSO's policy providing that discipline implemented more than three years prior to any potential infraction at issue should be disregarded.  *Id.*  Second, although Plaintiff argues that comparators are not a required element of a *prima facie* case of race discrimination, as evidence of pretext,  Plaintiff equally contends that Defendant "treated similar [sic] situated white employees, who violated the same rule Plaintiff is falsely accused of violating, preferentially."  *Id.*; *see generally Williams v. Florida Atl. Univ.*, 2017 WL 1881676, at *8 (S.D. Fla. May 9, 2017) ("The similarly situated prima facie case inquiry and the pretext inquiry 'are not hermetically sealed off from one

another.'") (quoting *Coleman v. Donahoe*, 667 F.3d 835, 857-58 (7th Cir. 2012)); *Coleman*, 667 F.3d at 858 (explaining that often "the prima facie case and the pretext analysis overlap," and "the similarly situated inquiry dovetails with the pretext question"). The Court finds both arguments unavailing.

With respect to Plaintiff's first argument, it does appear that at the time Plaintiff was randomly selected for a drug test on February 5, 2013, PBSO's random drug and alcohol testing policy had not been formally changed in writing to reflect that as of November of 2011, testing was to be conducted off-site by a designated third-party company. *See* ECF No. [69] at 3. But, under the circumstances, the point proves immaterial. To begin with, Plaintiff does not genuinely dispute Defendant's claim that approximately 250 corrections employees had previously undergone drug testing with the third-party company by the time Plaintiff was selected. *Compare* Def. SOF at ¶ 6 (citing ECF No. [31-3] at 7; ECF No. [31-9] at 19), *with* Pl. SOF at ¶ 6 ("Unknown, therefore denied."). Furthermore, and perhaps most importantly, Plaintiff does not dispute that while at Internal Affairs, he twice refused Sergeant Combs' orders to report to the testing facility in his personal vehicle and subsequently declined the same when Sheriff Bradshaw offered him the options of that reporting or being placed on administrative leave. *See* Def. SOF at ¶¶ 9-10. This Court's "sole concern is whether unlawful discriminatory animus motivates a challenged employment decision[,]" *Wilson*, 376 F.3d at 1092 (quoting *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999)). Here, both of these considerations undercut, rather than support, such a conclusion. At most, the overall circumstances surrounding the orders given to Plaintiff to submit to a drug test conducted away from Internal Affairs by a third-party company and Plaintiff's refusal to comply with those orders were unfair, given what was reflected in PBSO's written policy at the time; or, as Plaintiff

suggests, he was not technically insubordinate as he did not actually violate a written work place rule. But this is not enough. "An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct." *Damon v. Fleming Supermarkets of Florida*, 196 F.3d 1354, 1363 n.3 (11th Cir. 1999); *see also Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) ("An employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.") (quoting *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984)). "Indeed, an employer is under no obligation to be fair and has the 'right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules.'" *Williams*, 2017 WL 1881676, at *7 (quoting *Nix*, 738 F.2d at 1187). Ultimately, Plaintiff may have arrived at Internal Affairs willing and able to submit to a drug test so long as it was administered in a manner consistent with what PBSO's policy on the books specifically provided. However, that does not extinguish the natural import of his three refusals to comply with direct orders given to him by individuals with supervisory authority over him—that import being that a perception of insubordination, rather than discriminatory intent, was the driving factor in the subsequent decision to terminate Plaintiff. *See generally Wilson*, 376 F.3d at 1092 (explaining that whether "[the plaintiff's] conduct was insubordinate is not an issue for this Court to referee").

The same can be said for the other purported deviation from PBSO policy asserted by Plaintiff—that is, that Defendant reviewed all of Plaintiff's disciplinary history rather than limiting such review to the three years preceding the February 5, 2013 incident. The PBSO rule cited to by Plaintiff provides for the implementation of disciplinary measures, and it states in part that "[m]inor infractions [] that occurred more than one year prior to the current infraction. . . .

[and] [m]ajor infractions that occurred more than three years prior to the current infraction *should* be disregarded." ECF No. [67-2] at 3 (emphasis added). However, beyond the fact that the rule does not appear to be a mandate, the rule, when read in context, expressly contemplates the comprehensive review purportedly employed by Defendant. It provides as follows: "Major infractions that occurred more than three years prior to the current infraction should be disregarded. Nevertheless, supervisors should be alert to prior misconduct which indicates a trend, particularly in cases involving possible violence or criminal conduct." *Id.*

The Court concludes that neither fact - that PBSO's written random drug and alcohol testing policy did not reflect the specific testing procedures or that all of Plaintiff's disciplinary history was considered - represents such a deviation from PBSO policy so as to allow a reasonable factfinder to view Defendant's proffered reason for Plaintiff's termination unworthy of credence. *See Ivey*, 222 F. App'x at 818. Moreover, Plaintiff's attempt to analogize *Munoz v. Oceanside Resorts, Inc.*, 223 F.3d 1340 (11th Cir. 2000), only serves to further illuminate how short the above mentioned evidence falls in demonstrating pretext. In *Munoz*, the plaintiff, a room service waiter, brought an age discrimination claim against his former resort-employer after he was fired on the stated basis of insubordination. *Id.* at 1333-34. In affirming the district court's denial of the defendant's motions for judgment as a matter of law following a jury verdict in the plaintiff's favor, the Eleventh Circuit noted a "substantial quantum of evidence" of pretext offered by the plaintiff. *See id.* at 1345. That evidence included, *inter alia*, the following: "Munoz was employed with the Resort for twenty-seven years, during which he never before received a documented reprimand. . . . Munoz was terminated following a single warning, which Munoz alleges contravened the Resort's policy as outlined in its employee handbook that termination would follow three warnings[.]" *Id.* at 1345 n.5. Here, Plaintiff has failed to provide

a substantial quantum of pretext evidence comparable to the one provided by the plaintiff in *Munoz*. Plaintiff concedes that during his employment with PBSO he was disciplined for insubordination-related offenses on several occasions. Def. SOF at ¶ 2. With respect to his refusal to submit to a drug test as ordered by Internal Affairs on February 5, 2013, the relevant PBSO rule provides in relevant part that "[r]efusing to submit[] [or] failing to appear when directed . . . is cause for discipline up to, and including, *termination for a first offense*." ECF No. [67-1] at 14 (emphasis added). Further, and perhaps even more determinative, the underlying event that formed the basis of the defendant's decision to terminate the plaintiff in *Munoz*—i.e., the plaintiff's purported insubordination—was in legitimate dispute. *See Munoz*, 223 F.3d at 1333-34. Specifically, after receiving his first and only reprimand from the defendant, the plaintiff was instructed not to discuss the reprimand with anyone—which the defendant claimed the plaintiff did, and the plaintiff denied. *Id.* The Eleventh Circuit found the "factual conflict" especially relevant with respect to the plaintiff's theory, which was based in part on a "false accusation of insubordination," particularly as the conflict related to credibility determinations the jury may have made. *See id.* at 1345. Here, by contrast, there are no factual conflicts regarding the circumstances surrounding Plaintiff's purported insubordination in refusing to submit to a drug test as ordered by Internal Affairs, and thus no related credibility concerns that would require resolution. For these reasons, Plaintiff's reliance on *Munoz* is simply inapposite.

Plaintiff's second argument for pretext fares no better than his first, as Sergeant Burrows and Deputy Plant—who were both found by Internal Affairs to have violated certain PBSO rules but whose respective disciplinary measures did not rise to termination—were not similarly situated to Plaintiff. As such, neither are proper comparators. First, with respect to Sergeant Burrows, the record reflects that he became the subject of an Internal Affairs investigation after

PBSO received a complaint that he was using controlled substances illegally obtained from a retired PBSO employee. *See generally* ECF No. [67-6] at 84-108; *see also* ECF No. [67-5] at 6-7. Upon receiving an order to submit to a drug test by Sergeant Lawrence Colagiovanni ("Sergeant Colagiovanni") at the outset of that investigation, Sergeant Burrows informed Sergeant Colagiovanni that he would be checking himself into a drug detox facility through assistance provided by PBSO's Employee Assistance Program ("EAP"). ECF No. [67-5] at 14. According to Sergeant Burrows, he was advised by Sergeant Colagiovanni shortly afterwards not to worry about the drug test and to report to the treatment facility. *Id.* Importantly, there is no genuine dispute that Sergeant Burrows was never found to have refused an order from Internal Affairs to take a drug or alcohol test. *See* Def. SOF at ¶ 18; *see also* ECF No. [67-5] at 14 ("Q Did they ask you to submit a sample? A Yes. Q And you refused? A No. Q You agreed to give a sample? A I informed them that I was  - - had already contacted EAP and was en route to a facility. . . . [A]bout ten or 15 minutes pass by and [Colagiovanni] called me back and said, Don't worry about the urine sample, just go to your treatment facility. That's the last I heard about it.").

Plaintiff inaccurately asserts otherwise, *see* Pl. SOF at ¶ 18 (asserting without citation to the record that "Burrows refused to submit to a drug test"); ECF No. [67] at 13 ("Colagiovanni detremined [sic] in his investigation that Burrows violated several rules, including the refusing to submit to a urinalysis . . . .") (citing ECF No. [67-6] at 35-37), and these efforts are misleading at best. The relevant rule violation actually reflected by the record evidence Plaintiff cites to— namely, the deposition testimony of Sergeant Colagiovanni (who investigated Sergeant Burrows' case)—is that Sergeant Burrows failed the drug test administered at the treatment facility he

checked himself into the same day he checked in, the results of which were made available to

PBSO:

> Q. Okay. Let's talk about your findings . . . . What were your findings on this case?
> A. I found that in charge Number 1, which was "Violation of laws, policies, or rules and regulations relating to the Office of the Sheriff to wit, General Order 300.001 A, drug/alcohol testing," a preponderance of evidence did exist, that he violated that rule and regulation.
> . . . .
> Q. I'm sorry, you said you found a standard of conduction violation for Count I that had to do with drug and alcohol testing?
> A. Right. Well, the first one for the drug and alcohol testing falls under IX (54) which was violation of laws, policies, or rules and regulations relating to the Office of the Sheriff. . . .
> Q. I believe that somewhere along the line I read somewhere that Burrows had said that you folks can get the drug testing from the facility he's going to. Was that made available at any point?
> A. It was. . . . [T]hey actually drafted the consent form for me to get his medical records inclusive of his drug testing at the detox facility he went to.
> Q. And what was the result of that testing?
> A. I don't remember the specifics, but I know he tested positive for one of the - - I can't remember if it's hydrocodone, oxycodone. It was one of those.
> Q. Did he have a prescription to use the medication?
> A. For the one that he tested positive for, he did not. *That's why I found a preponderance of evidenced existed for that standard of conduct violation.*
> Q. Do we know - - or do you know when he took the actual test at this facility as opposed to the day that you and the other sergeant were going to test him?
> A. If I remember correctly, I can't say for certain, but I believe it's the same date.
> . . .
> Q. You found a violation of 300.001 A which is drug and alcohol testing. What specifically did he violate in that policy?
> A. Sure. Let's see. The main crux I remember was *he had taken a medication that he didn't have a valid prescription for.*

ECF No. [67-6] at 35-38 (emphasis added). As the record makes clear, unlike Plaintiff, the

disciplinary measures imposed against Sergeant Burrows, based in part on a failed drug test,[9] had

nothing to do with insubordination in the form of a refusal to submit to a drug test. For that

reason alone, the Court does not consider Sergeant Burrows as similarly situated to Plaintiff.

---

[9] Internal Affairs also found that Sergeant Burrows had violated PBSO rules by possessing a controlled substance without a valid prescription and generally for conduct unbecoming. *See* ECF No. [67-6] at 107-08; *see also* ECF No. [67-5] at 28; ECF No. [67-6] at 35-37.

Sergeant Burrows is therefore not an appropriate comparator in this case. *See Summers*, 444 F. App'x at 347 ("The quantity and *quality* of the comparator's misconduct must be '*nearly identical*' to the plaintiff's misconduct, in order 'to prevent courts from second-guessing employers' reasonable decisions.'") (quoting *Burke–Fowler*, 447 F.3d at 1323) (emphasis added); *Burke-Fowler*, 447 F.3d at 1325 ("Different types and degrees of misconduct may warrant different types and degrees of discipline."); *Holifield*, 115 F.3d at 1562 ("In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and disciplined in different ways.").

As for Deputy Plant, the comparison to Plaintiff is somewhat closer, but not close enough. Deputy Plant was found to have violated the same PBSO rule as Plaintiff when he refused to submit to a breath alcohol test after he was suspected of operating a PBSO patrol vehicle off-duty while under the influence of alcohol. *See* Def. SOF at ¶ 19; Pl. SOF at ¶ 19; *see also* ECF No. [67-1] at 18. Deputy Plant's circumstances, however, were markedly different from Plaintiff's circumstances in two important aspects. First, unlike Plaintiff, Deputy Plant was a member of the Palm Beach County Police Benevolent Association ("PBA"), the union that represented PBSO deputies. Def. SOF at ¶ 19; Pl. SOF at ¶ 19. The PBA eventually intervened in the matter regarding the Internal Affairs investigation of Deputy Plant, but before it did, Internal Affairs had recommended that Deputy Plant be terminated based on the findings of its investigation—just as it would later recommend in Plaintiff's case. *See* Def. SOF at ¶ 19; Pl. SOF at ¶ 19; *see also* ECF No. [62-1] at ¶ 3. Indeed, Defendant, according to him, approved that recommendation subject to Deputy Plant's right to a "pre-disciplinary hearing." ECF No. [62-1] at ¶ 3. Shortly after Internal Affairs' recommendation and prior to a pre-disciplinary hearing

ever taking place, the PBA intervened, challenging the recommendation of termination. *Id.*; *see also* Def. SOF at ¶ 19; Pl. SOF at ¶ 19. Then, and only then, did Defendant decide to impose a lesser discipline—namely, an 80 hour suspension without pay—a decision Defendant states was on the basis that the PBA had convinced him of "extenuating circumstances" for Deputy Plant's conduct. *See* ECF No. [62-1] at ¶ 3. The final product of Defendant and the PBA's negotiations was memorialized in a Settlement Agreement, which indicated that Deputy Plant waived any right to have the matter heard at a pre-disciplinary meeting or hearing review board. *See id.* at 3. The Settlement Agreement also indicated a mutual understanding that "the refusal of a direct order to submit to a drug test is potentially, on its face, grounds for termination." *Id.* In the Court's view, the PBA's intervention on behalf of Deputy Plant with a primary goal of seeking a reduction in Deputy Plant's discipline (even disregarding the apparent success of the intervention) and the lack of some comparable circumstance in Plaintiff's case undercuts any notion that the two were "similarly situated in *all relevant aspects.*" *Addison*, 2017 WL 1130175, at *4 (emphasis added).

The second important distinction between Deputy Plant and Plaintiff is their respective disciplinary histories. Unlike Plaintiff, who had been disciplined for insubordination-related violations on several occasions throughout his employment, there is no dispute that Deputy Plant had never before been disciplined for insubordination. Def. SOF at ¶ 19; Pl. SOF at ¶ 19. According to Defendant, the lack of any prior discipline for insubordination in Deputy Plant's record played a role in his decision to impose a lesser discipline upon negotiating with the PBA. *See* ECF No. [62-1] at ¶ 3; ECF No. [67-3] at 10. Notably, Plaintiff does not challenge this. The disparity in disciplinary records also precludes a finding that Deputy Plant and Plaintiff were similarly situated in "all relevant aspects." *Addison*, 2017 WL 1130175, at *4.

Plaintiff asserts that Defendant "did not consider [his] prior disciplinary history per [Defendant's] deposition[,]" Pl. SOF at ¶ 19, and that Plaintiff's prior disciplinary history is a "new justification [] raised as an after the fact justification for the termination[,]" ECF No. [67] at 2-3 (emphasis omitted). However, Plaintiff offers no citation to the record lending any material support for these conclusory assertions, *see generally Chavez v. Sec'y Florida Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[D]istrict court judges are not required to ferret out delectable facts buried in a massive record.").[10] Moreover, on this point, the Court notes a patent contradiction. As discussed earlier, Plaintiff argues that Defendant's claim that he reviewed all of Plaintiff's disciplinary history—particularly beyond the three year period preceding the February 5, 2013 incident—would constitute a deviation from PBSO policy. *See* ECF No. [67] at 12. Notably, Plaintiff characterizes that claimed review as a "clear deviation[] from the Defendant's own rules[,]" a deviation Plaintiff in turn offers as evidence of pretext. Implying that such a review did in fact take place and factored into Plaintiff's termination— hence the "clear deviation" in policy—Plaintiff argues in that context as follows: "An employer's failure to follow its own internal employment procedures can constitute evidence of pretext. Defendant's failure to play it by the book, and follow its own rules, is probative that the stated reason for terminating Plaintiff was pretextual." *Id.* (internal citations omitted). Yet in his attempt to analogize his circumstances with those of Deputy Plant's, Plaintiff claims just the opposite. He vehemently asserts that such a review never actually took place, let alone played a role in his termination. *See* Pl. SOF at ¶ 20; ECF No. [67] at 2-3. Here, Defendant either did

---

[10] At most, Plaintiff cites to the termination letter sent to him by PBSO on April 19, 2013, *see* ECF No. [67-7], which as Plaintiff points out, "makes no mention whatsoever of the past disciplinary history being a basis for the Plaintiff's termination[,]" ECF No. [67] at 2. The Court, however, does not consider the letter as indicative of pretext given that it refers generally to "the issues contained within the Division of Internal Affairs Case# IA 13-012 where charges were investigated and sustained administratively." ECF No. [67-7].

consider all of Plaintiff's disciplinary history in his decision to terminate Plaintiff, as he contends, or Defendant did not. That Defendant did so is plausible given the lack of dispute that Defendant made essentially the same consideration in deciding to reduce Deputy Plant's discipline and that PBSO's disciplinary policy specifically calls for "supervisors [to] be alert to prior misconduct which indicates a trend . . . ." ECF No. [67-2] at 3. The Court concludes that, like Sergeant Burrows, Deputy Plant is not an appropriate comparator in this case. *See Summers*, 444 F. App'x at 347; *Burke-Fowler*, 447 F.3d at 1325; *Holifield*, 115 F.3d at 1562.

Accordingly, Plaintiff has failed to provide sufficient evidence from which a rational trier of fact could conclude that the legitimate, non-discriminatory reason for his termination as proffered by Defendant was pretextual. As explained above, neither what Plaintiff characterizes as Defendant's deviation in PBSO policy nor Defendant's handling of Sergeant Burrows' and Deputy Plant's respective disciplinary cases qualifies as such evidence. Defendant is therefore entitled to summary judgment on Count I.

### B. Retaliation Claim under 42 U.S.C. §§ 1981 and 1983 (Count II)

Under 42 U.S.C. § 1981, retaliation claims relying solely on circumstantial evidence essentially employ the same analytical framework used for addressing discrimination claims that also rely solely on circumstantial evidence. *See Bryant*, 575 F.3d at 1307 ("Absent direct evidence of discrimination, when analyzing claims for race-based retaliation brought under § 1981, [the Eleventh Circuit] employ[s] the tripartite analytical framework developed by the Supreme Court in [*McDonnell Douglas*, 411 U.S. 792].").  "Under this framework, a plaintiff alleging retaliation must first establish a prima facie case by showing that: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) he established a causal link between the protected activity and the adverse action." *Id.* at 1307-08.

In turn, the *prima facie* case creates a presumption that "the adverse action was the product of an intent to retaliate." *Id.* at 1308. The burden of production then shifts to the defendant to rebut the presumption by articulating a legitimate, non-discriminatory reason for the adverse employment action. *Id.* Once the defendant makes this showing, the burden shifts back to the plaintiff to show that the proffered reason is a mere pretext to mask discriminatory actions. *Id.*

Plaintiff argues that Defendant's decision to terminate him was retaliation for his "complaints of discrimination from 2006 to 2012." ECF No. [67] at 18. Regardless of whether the discrimination complaints Plaintiff refers to are sufficient to establish a *prima facie* case of retaliation,[11] the Court finds that, as explained above, Plaintiff has failed to rebut Defendant's legitimate, non-discriminatory reason for Plaintiff's termination—that is, Plaintiff's repeated refusal to comply with directives from Internal Affairs to submit to a drug test in light of his disciplinary history. *See id.* at 18-19 (relying on the same pretext arguments raised in support of Plaintiff's discrimination claim). Accordingly, Defendant is also entitled to summary judgment on Count II.

---

[11] In any event, the Court finds that they are not, as Plaintiff has failed to establish a causal link between them and his termination. To begin with, Plaintiff concedes that neither Defendant nor any other PBSO officials involved in the investigation that led to his termination ever mentioned to Plaintiff any of his prior complaints or litigation, Def. SOF at ¶ 21. Plaintiff ultimately relies on the same evidence to prove his retaliation claim that, as explained, is insufficient to prove his discrimination claim, *see* ECF No. [67] at 18-19. Moreover, although Plaintiff references complaints made by him between 2006 to 2012, he does not identify any corresponding record evidence, *see* ECF No. [67] at 18, and the Court has not identified such through its own independent review of the record. Instead, the undisputed material facts reflect that the last claimed protected activity Plaintiff engaged in prior to his termination was a 2005 lawsuit for race discrimination—more than seven years prior to his termination in 2013. *See* Def. SOF at ¶ 16; Pl. SOF at ¶ 16; *see generally Chavez*, 647 F.3d at 1061 ("[W]e are not obligated to cull the record ourselves in search of facts not included in the statements of fact.") (quoting *Johnson v. City of Fort Lauderdale*, 126 F.3d 1372, 1373 (11th Cir.1997)). To that extent, the substantial gap in time is dispositive. *See Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) ("If there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law."); *see also, e.g., Grant v. Miami-Dade Cty. Water & Sewer Dep't*, 636 F. App'x 462, 469 (11th Cir. 2015) (no causal link where nine-month period elapsed between filing of last discrimination charge and occurrence of alleged adverse employment action) (citing *Higdon*, 393 F.3d at 1220).

## IV. CONCLUSION

For the reasons stated herein, it is **ORDERED AND ADJUDGED** that Defendant's Renewed Motion for Summary Judgment, **ECF No. [63]**, is **GRANTED**. To the extent not otherwise disposed of, all pending motions are **DENIED** as moot. Final Judgment will be entered by separate order. All pending hearings are **CANCELED.** The Clerk is instructed to **CLOSE** the case.

**DONE AND ORDERED** in Miami, Florida this 12th day of June, 2017.

_____

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record